ADAM GORDON
United States Attorney
BETSEY BOUTELLE
Assistant U.S. Attorney
California Bar No. 299754
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 546-8764
Facsimile: (619) 546-7751
Email: betsey.boutelle@usdoj.gov

Attorneys for Federal Defendants[1]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| COUNTY OF SAN DIEGO,<br><br>                    Plaintiffs,<br><br>        v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>                  Defendants. | Case No.: 26-cv-01520-JES-MSB<br><br>**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:  May 6, 2026<br>Time:  11:00 a.m.<br>Crtrm:  4B<br>Judge: Hon. James E. Simmons, Jr. |
|---|---|

---

[1] Defendants U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Markwayne Mullin, Secretary of Homeland Security, and Todd Lyons, Acting Director of Immigration and Customs Enforcement, are collectively referred to herein as the "Federal Defendants."

# TABLE OF CONTENTS

PAGES

I.    INTRODUCTION ..................................................................................... 1

II.   FACTUAL AND PROCEDURAL BACKGROUND .................................. 2

    A.    Congress has charged ICE with arranging for "appropriate" immigration detention facilities operated by contractors at ICE's direction. ...................... 2

    B.    California has engaged in various attempts to regulate federal immigration detention facilities, most recently via Health & Safety Code Section 101045. ............................................................................ 4

    C.    Otay Mesa Detention Center is routinely subject to oversight inspections pursuant to federal, state, and local laws and regulations. ........................... 6

    D.    During a partial government shutdown, the County for the first time demands an inspection of Otay Mesa Detention Center pursuant to Section 101045 and "Title 15 minimum standards." ...................................... 8

III.  LEGAL STANDARD ................................................................. 13

IV.   ARGUMENT ..................................................................... 14

    A.    Plaintiff is unlikely to succeed on the merits of its claims ........................... 14

        1.  Plaintiff's claims are barred by the Supremacy Clause ........................... 14

        2.  Plaintiff's claims fail on the merits ........................................... 17

    B.    Plaintiff will not suffer irreparable harm in the absence of immediate relief ................................................................................. 19

    C.    The remaining preliminary injunction factors weigh in Defendants' favor ................................................................................. 20

    D.    Plaintiff's requested preliminary injunctive relief violates Federal Rule of Civil Procedure 65 ........................................................... 21

    E.    Any injunctive relief should be accompanied by a bond ........................... 21

V.    CONCLUSION .......................................................................... 22

# TABLE OF AUTHORITIES

PAGES

**CASES**

*Arizona Dream Act Coalition v. Brewer*,
757 F.3d 1053 (9th Cir. 2014)..................................................................................20

*Arizona v. Bowsher*,
935 F.2d 332 (D.C. Cir. 1991)..................................................................................14

*Arizona v. United States*,
567 U.S. 387 (2012) ..................................................................................................16

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) ....................................................................................15

*California Pharmacists Association v. Maxwell-Jolly*,
563 F.3d 847 (9th Cir. 2009) ....................................................................................21

*Caribbean Marine Services Co. v. Baldridge*,
844 F.2d 668 (9th Cir 1988) .....................................................................................19

*Committee of Central American Refugees v. INS*,
795 F.2d 1434 (9th Cir.) .............................................................................................2

*D.A. v. United States*,
663 F.Supp.3d 715 (W.D. Tex. Mar. 23, 2023) ..........................................................3

*Florida Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132, (1963) ................................................................................................16

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ....................................................................................13

*Gartrell Construction Inc. v. Aubry*,
940 F.2d 437 (9th Cir. 1991) ....................................................................................14

*Geo Group, Inc. v. Newsom*, No. 2:24-CV-02924-DAD-CSK,
2025 WL 1285728 n.7 (E.D. Cal. May 2, 2025).................................................16, 17

*Geo Group, Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022)..................................................................................4, 16

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ........................................................................................................ 16

*In re National Security Agency Telecommunications Records Litigation*,
   633 F. Supp. 2d 892 (N.D. Cal. 2007) ........................................................................ 15

*Leslie Miller, Inc. v. Arkansas*,
   352 U.S. 187 (1956) ...................................................................................................... 14

*Lyon v. U.S. Immigration and Customs Enforcement*,
   171 F. Supp. 3d 961 (N.D. Cal. 2016) .......................................................................... 3

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) ....................................................................................... 13

*Mayo v. United States*,
   319 U.S. 441 (1943) ...................................................................................................... 14

*National Treasury Employees Union v. Trump*, No. 25-5157,
   2025 WL 1441563 n.4 (D.C. Cir. May 16, 2025) ....................................................... 21

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................................ 13, 20

*Portland Feminist Women's Health Ctr. v. Advocs. for Life, Inc.*,
   859 F.2d 681 (9th Cir. 1988) ....................................................................................... 19

*Rivera v. United States*, No. 17-CV-569-AJB-NLS,
   2018 WL 3239340 (S.D. Cal. July 2, 2018) .................................................................. 3

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
   739 F.2d 1415 (9th Cir. 1984) ..................................................................................... 13

*United States v. Arizona*,
   641 F.3d 339 (9th Cir. 2011) ....................................................................................... 20

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ................................................................... 3, 4, 5, 15, 16

*Washington v. United States*,
   460 U.S. 536 (1983) ...................................................................................................... 15

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................ 13, 19, 20

**STATUTES**

5 U.S.C. § 552a ............................................................................................... 10
5 U.S.C. § 552a(b) ......................................................................................... 10
5 U.S.C. § 706(1) ........................................................................................... 14
5 U.S.C. § 706(2)(A) ...................................................................................... 14
6 U.S.C. § 112(b)(2) ......................................................................................... 2
6 U.S.C. § 557 ................................................................................................... 2
8 U.S.C. § 1231(g)(1) .................................................................................... 2, 3
Cal. H.S.C. § 101045 ............................................................................... *passim*

**RULES**

Federal Rule of Civil Procedure 65(c) .......................................................... 21
Federal Rule of Civil Procedure 65(d) .......................................................... 21

**REGULATIONS**

6 C.F.R. § 5.21(d) ........................................................................................... 11
8 C.F.R. § 235.3(e) ........................................................................................... 3
48 C.F.R. § 1.601(a) .......................................................................................... 2
48 C.F.R. § 3017.204-90 ................................................................................ 2, 3

**OTHER AUTHORITIES**

S.B. 1132 ........................................................................................................... 5
A.B. 103 ............................................................................................... 4, 5, 7, 12

## I.    INTRODUCTION

The County of San Diego seeks a preliminary injunction from this Court ordering the federal government to grant the County's Public Health Officer (and whomever he may designate) unprecedented levels of access to secure areas of a contractor-operated federal immigration facility and its sensitive immigration detainee records. That access would include the obligatory disclosure of detainees' personal medical charts for the County's review without the detainees' advance knowledge or consent. Plaintiff claims that these actions are necessary for the County to complete its health and safety inspection of Otay Mesa Detention Center (OMDC) pursuant to California's "Title 15 standards" for detention facilities—a voluminous array of state regulations that Plaintiff acknowledges do not actually govern federal facilities and are not enforceable against OMDC.

The County's expansive demand is without precedent. Both before and after the County's health and safety inspection at OMDC on February 20, 2026, officials from Immigration and Customs Enforcement (ICE) and the facility contractor, CoreCivic, Inc., attempted to work with Plaintiff to understand the scope of the County's inspection request and what information OMDC personnel could reasonably be expected to provide based on the detailed 77-page explication of "Title 15 standards" that the County transmitted to Defendants after the inspection. *See generally* Declaration of Chad E. Torres; Declaration of Warden C. LaRose. Consistent with past practices, ICE also restricted the inspection to qualified subject matter experts in public health. During the inspection itself, Defendants attempted to accommodate Plaintiff's inspection rights by affording the Public Health Officer access to facility areas—such as food service, laundry, and medical spaces—and interviews with healthcare and food services staff, in line with historical practice. Meanwhile, the Federal Defendants declined to disclose detainee medical records or permit detainee interviews without confirmation of the subjects' consent. The Federal Defendants nevertheless remained—and continue to remain—open to working with the County to resolve the County's request for additional information, as reflected in the follow-up emails

*Defendants' Opposition to Plaintiffs' Motion*          1          26-cv-01520-JES-MSB
*for Preliminary Injunction*

exchanged between the parties in the days following the February 20 inspection. ECF No. 3-2 at 45–53.

Dissatisfied, the County filed suit alleging violations of the Administrative Procedure Act. The County now seeks a preliminary injunction that would require all Defendants to grant Plaintiff access to additional secure spaces within OMDC, to admit two county supervisors as part of the inspection team, to disclose detainee medical records, and to facilitate detainee interviews. But those overbroad demands encroach upon federal authority in violation of the Constitution's Supremacy Clause. Thus, to the extent that the parties cannot resolve the issue informally, the Federal Defendants anticipate pursuing defenses to Plaintiff's complaint based on intergovernmental immunity and preemption, in addition to defending the claims on the merits. In the meantime, Plaintiff fails to meet the standards for a preliminary injunction. The Court should deny Plaintiff's motion.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Congress has charged ICE with arranging for "appropriate" immigration detention facilities operated by contractors at ICE's direction.

Congress has directed federal officials to detain noncitizens in various circumstances pending removal or a decision on removal. *See* 8 U.S.C. §§ 1225(b)(1)(B)(ii), (b)(2)(A), 1226(a), (c)(1), 1231(a)(6). The Immigration and Nationality Act provides that the Secretary of the Department of Homeland Security (DHS) "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1); *see also* 6 U.S.C. § 557. Section 1231(g)(1) gives both "responsibility" and "broad discretion" to the Secretary "to choose the place of detention for deportable aliens." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir.), *amended by* 807 F.2d 769 (9th Cir. 1986).

The Secretary also has general administrative powers to contract with private parties. The Secretary has "authority to make contracts . . . as may be necessary and proper to carry out the Secretary's responsibilities." 6 U.S.C. § 112(b)(2). Pursuant to federal procurement regulations, the Secretary has "authority and responsibility to contract for authorized

*Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction*          2          26-cv-01520-JES-MSB

supplies and services," and the Secretary "may . . . delegate broad authority to manage the agency's contracting functions to heads of such contracting activities." 48 C.F.R. § 1.601(a). ICE, a component of DHS, carries out immigration detention. As one option, ICE officials "may enter into contracts of up to fifteen years' duration for detention or incarceration space or facilities, including related services." 48 C.F.R. § 3017.204-90.

Through these statutes, Congress has authorized ICE to use private detention contractors or to contract with local, state, or other federal agencies. *See United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019). Indeed, Congress has expressed that the Secretary should favor the use of existing facilities for immigration detention, whether through purchase or lease. 8 U.S.C. § 1231(g)(1)–(2). And there are "significant fluctuations in the number and location" of detained individuals, requiring ICE to "maintain flexibility."

Pursuant to its statutory mandates, ICE identifies and regulates "appropriate" facilities. 8 U.S.C. § 1231(g)(1). Federal regulations and requirements govern every aspect of "detention or incarceration space or facilities." 48 C.F.R. § 3017.204-90. Chief among the federal requirements is "compliance with the Standard Statement of Work for Contract Detention Facilities," which incorporates ICE's Performance-Based National Detention Standards ("PBNDS"). 8 C.F.R. § 235.3(e); *Est. of Cruz-Sanchez by & through Rivera v. United States*, No. 17-CV-569-AJB-NLS, 2018 WL 3239340, at *3 (S.D. Cal. July 2, 2018) (granting "judicial notice of the Performance-Based National Detention Standards ('PBNDS') and the underlying contract between [the government] and CoreCivic" for operation of OMDC); *Lyon v. U.S. Immigration and Customs Enforcement*, 171 F. Supp. 3d 961, 990 (N.D. Cal. 2016) (noting mandatory application of PBNDS); *D.A. v. United States*, 663 F.Supp.3d 715, 740 (W.D. Tex. Mar. 23, 2023) (finding compliance with PBNDS is "non-discretionary duty").

The PBNDS is approximately 450 pages in length and includes detailed standards and requirements governing: (1) Safety, (2) Security, (3) Order, (4) Care, health and welfare, (5) Activities, (6) Justice, and (7) Administration and Management. *U.S. Customs*

*& Immigration Enforcement, Performance Based National Detention Standards 2011* (rev. Dec. 2016), *available at* https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf. Of particular relevance here, the PBNDS includes 25 pages of detailed requirements for medical care. *Id.* §§ 4.3A–GG.

The current PBNDS was implemented at the direction of Congress: "Within 45 days after the date of enactment of this Act, ICE shall report on its progress in implementing the 2011 PBNDS . . . including a list of facilities that are not yet in compliance; a schedule for bringing facilities into compliance . . . The Committee expects ICE to refrain from entering into new contracts or IGSAs that do not require adherence to . . . 2011 PBNDS standards." H.R. Rep. No. 114-668, at 35 (2016). And, as noted, mandatory compliance is incorporated into every ICE detention contract, including the contract with CoreCivic at issue in this case.

**B.    California has engaged in various attempts to regulate federal immigration detention facilities, most recently via Health & Safety Code Section 101045.**

In 2019, California enacted Assembly Bill 32 ("AB-32") which purported to outlaw any "private detention facility within the state." The Ninth Circuit, sitting en banc, struck down AB-32 as violative of the Supremacy Clause of the United States Constitution as to contractor-operated federal immigration facilities. *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 752 (9th Cir. 2022).

California similarly enacted several statutes (AB-103, AB-54, AB-450) aimed at "protecting immigrants from an expected increase in federal immigration enforcement actions." *United States v. California*, 921 F.3d 865, 875 (2019) (citation omitted). As relevant here, the court struck down portions of AB-103 as unlawful under the doctrine of intergovernmental immunity, but upheld limited provisions of AB-103 that allowed the California Attorney General ("AG") to enter ICE immigration detention facilities to conduct "reviews" of the conditions of confinement and the standard of care. *Id.* at 885–86. Notably, in defense of those narrow "review" provisions, California correctly argued that

"AB 103 does not impose standards on the conditions of facilities, nor does it mandate any policies and procedures." As a result, California noted "there is no conflict with the national detention standards promulgated by ICE," and that AB-103 includes "no enforcement mechanism." In reaching its decision, the Ninth Circuit specifically noted that AB-103 did not regulate confinement, require that federal detention conform to state law, or impose mandates on the ICE contractors, but merely required access for inspections and the production of data. *California*, 921 F.3d at 885.

Unsatisfied with the AG-led inspections authorized by AB-103, California amended Health and Safety Code section 101045 to require private detention centers to permit access to county health officials, in order to "empower[] them to ensure that these private facilities adhere to public health orders and guidelines that are necessary to keep our state safe." 08/07/24 Assembly Floor Analysis, S.B. 1132 Sen., at 2, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240SB1132 (last visited Apr. 15, 2026). Effective as of January 1, 2025, Section 101045 provides in relevant portion:

> 101045. (a) The county health officer shall, at least annually, investigate health and sanitary conditions in a county jail, publicly operated detention facility in the county, and private work furlough facility and program established pursuant to Section 1208 of the Penal Code. … The county health officer may make additional investigations of a county jail, private detention facility, or other detention facility of the county as they determine necessary. … In a city having a health officer, the city health officer shall, at least annually, investigate health and sanitary conditions in a city jail and other detention facility. The city health officer may make additional investigations of a city jail, private detention facility, or other detention facility as they determine necessary.
>
> (b) Whenever requested by the sheriff, the chief of police, local legislative body, or the Board of State and Community Corrections, but not more often than twice annually, the county health officer or, in cities having a city health officer, the city health officer, shall investigate health and sanitary conditions in a jail or detention facility described in this section, and submit a report to each of the officers and agencies authorized in this section to request the investigation and to the Board of State and Community Corrections.
>
> (c) The investigating officer shall determine if the food, clothing, and bedding is of sufficient quantity and quality that at least shall equal minimum standards and requirements

> prescribed by the Board of State and Community Corrections for the feeding, clothing, and care of prisoners in local jails and detention facilities, and if the sanitation requirements required by Article 1 (commencing with Section 114250) of Chapter 8 of Part 7 of Division 104 for restaurants have been maintained.

The "minimum standards and requirements prescribed by the Board of State and Community Corrections" referenced in Section 101045(c) are found at Cal. Code Regs, tit. 15, §§ 1000–1282 ("Title 15"). These minimum standards, and those incorporated therein by reference, impose hundreds of significant detailed requirements and compliance obligations in the following areas: (1) Inspection and Application of Standards, (2) Training, Personnel, and Management, (3) Records and Public Information, (4) Classification and Separation, (5) Programs and Services, (6) Discipline, (7) Minors in Jails, (8) Minors in Temporary Custody in a Law Enforcement Facility, (9) Minors in Court Holding Facilities, (10) Medical/Mental Health Services, (11) Food, (12) Clothing and Personal Hygiene, (13) Bedding and Linens, and (14) Facility Sanitation and Safety. *See* Cal. Code Regs, tit. 15, §§ 1000–1282. The complete Title 15 standards go far above and beyond the "health and sanitary conditions" and "food, clothing and bedding" that Section 101045 authorizes any county health officer to investigate.

## C.  Otay Mesa Detention Center is routinely subject to oversight inspections pursuant to federal, state, and local laws and regulations.

ICE contracts with CoreCivic, Inc., to provide secure residential immigration detention services at OMDC. CoreCivic manages overall OMDC facility operations, security, and transportation in consultation with ICE. Torres Decl. at ¶ 4; LaRose Decl. at ¶¶ 7–10.

OMDC is routinely subject to a comprehensive array of audits and oversight inspections to ensure compliance with federal standards and regulations. Torres Decl. at ¶ 5; LaRose Decl. at ¶¶ 45–50. These include annual inspections conducted by the ICE Office of Detention Oversight (ODO), unannounced inspections by the ICE Office of Professional Responsibility (OPR), and audits under the ICE Sexual Abuse and Assault Prevention and Intervention Program (SAAPI). Torres Decl. at ¶ 5. These reviews assess

detainee care, communication, medical services, safety and security, access to legal assistance, and adherence to the PBNDS. *Id.* In addition, OMDC undergoes annual health inspections, such as the ICE Quality Medical Care inspection, ICE Health Service Corps (IHSC) Site Visit Audit, and the independent National Commission on Correctional Health Care (NCCHC) audit. *Id.* OMDC also maintains accreditation from the American Correctional Association (ACA). *Id.* Further, OMDC has historically been subject to the various area-specific inspections by agencies of the County of San Diego. *Id.*; LaRose Decl. ¶¶ 55–56. Those include the County's annual Food Service Inspection, the last of which was conducted on June 4, 2025. The County's three-page report from that inspection reflects an inspection score of 94% ("Grade: A"). Torres Ex. 1. The report reflects that OMDC's permit is valid through September 30, 2026. Historically, County inspections have been conducted by subject matter experts in public health. Torres Decl. ¶ 5.[2]

Since California's implementation of AB-103, OMDC has also hosted biennial inspections by the California AG pursuant to that statute. LaRose Decl. at ¶¶ 50–52. As Warden LaRose describes, the California AG begins that process by sending a detailed letter relating to the focus of their inspection, including identification of any specific policies or documents they would like to review as part of the inspection. *Id.* During the inspection, the California AG attorneys and staff are accompanied by subject matter experts relating to their focus during a particular inspection period. *Id.* When the California AG teams are permitted to interview detainees, the inspection teams may only interview detainees who sign a privacy waiver and agree to speak to them. *Id.* Likewise, to the extent that the California AG subject matter experts are permitted to review detainee records, they are only allowed to review records which the individual detainee authorizes them to review. *Id.*

---

[2] Dr. Thihalolipavan's declaration in support of Plaintiff's motion states that his desire to conduct a Title 15 inspection of OMDC was motivated in part by "[c]oncern that there are potentially no inspections or inadequate inspections taking place," based on his perusal of "DHS' website." ECF No. 3-2 at 3. Dr. Thihalolipavan appears to have been unaware of the County's recent and regular inspections of OMDC.

*Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction*    7    26-cv-01520-JES-MSB

**D.** **During a partial government shutdown, the County for the first time demands an inspection of Otay Mesa Detention Center pursuant to Section 101045 and "Title 15 minimum standards."**

On February 9, 2026, Warden LaRose received an email and attached letter from San Diego County Health Officer Dr. Thihalolipavan, requesting a County inspection of OMDC. LaRose Decl. at ¶ 14. While the letter cited California Health & Safety Code section 101045, it did not reference "Title 15 minimum standards" or expressly alert Warden LaRose to the fact that the County expected to receive access to areas and records not sought in the County's previous inspections. ECF No. 3-2 at 11. The parties agreed on a date, and the County subsequently submitted clearance applications for Dr. Thihalolipavan, NCCHC Resources contractor Nancy Booth, County Supervisor Paloma Aguirre and County Supervisor Terra Lawson-Remer. LaRose Decl. at ¶ 16. During the parties' preparations, Dr. Thihalolipavan orally explained to OMDC Clinical Director Dr. Patterson that he and Ms. Booth would focus on the Environmental, Medical, and Mental Health portions of the Title 15 standards. *Id.* at ¶ 22. Dr. Thihalolipavan told Dr. Patterson that he did not know what County Supervisors Aguirre and Lawson-Remer intended to focus upon when they arrived roughly three and a half hours later. *Id.*, LaRose Attm. C.

The day before the scheduled inspection, on February 19, 2026, Dr. Thihalolipavan spoke with Warden LaRose's assistant and sent her an email indicating that as part of the inspection, he was requesting to review charts, "may also talk to individuals," and requested that CoreCivic seek permission from ICE to allow him to do so. *Id.* at 23; LaRose Attm. D.

On February 20, 2026, Dr. Thihalolipavan and Ms. Booth arrived for the inspection shortly after 9:00 a.m. LaRose Decl. at ¶ 28. They met with ICE personnel, Warden LaRose, and Managing Director Thomas, and asked some basic questions about the facility to which OMDC officials provided answers. *Id.* There were some additional questions that OMDC officials requested Dr. Thihalolipavan and Ms. Booth submit in written form, to ensure that correct information was provided. *Id.* For approximately the next two hours, OMDC

personnel accompanied Dr. Thihalolipavan and Ms. Booth while they inspected the facility, including the dining hall and kitchen area, the laundry area, and the medical area. *Id.* at ¶¶ 31–34. In multiple areas, the inspectors asked questions of staff and took notes. *Id.* During this inspection, neither Dr. Thihalolipavan nor Ms. Booth requested to view any area other than food service, medical, or reception and discharge. *Id.* at ¶ 39. They did not request to visit any housing areas. *Id.* Warden LaRose recalls that both Dr. Thihalolipavan and Ms. Booth reported that they were impressed with the portions of the facility they observed. *Id.* at ¶ 39.

Meanwhile, County Supervisors Lawson-Reed and Aguirre arrived at the facility at approximately 1:00 p.m. and met with ICE personnel. *Id.* at ¶ 36. Because ICE determined those individuals were not public health professionals with the appropriate subject matter expertise to conduct health and safety inspections (based on the qualifications submitted by the County), ICE declined to permit them access to any detainee areas of the facility at that time. *Id.* at ¶ 37; Torres Decl. ¶ 8.

On February 23, 2026, Warden LaRose received a letter from Dr. Thihalolipavan indicating that his observations from February 20 were limited and "insufficient to complete the inspection report." ECF No. 3-2 at 43. Warden LaRose found it surprising that Dr. Thihalolipavan indicated he was denied access to housing areas and policies, since he had not asked to visit the housing areas or review policies either prior to or during his inspection. LaRose Decl. at ¶ 42.

In addition, while Dr. Thihalolipavan's post-inspection letter referenced policies, he did not specify any particular policies that he now wished to review. *Id.* at ¶ 43. There are approximately 209 CoreCivic policies approved for use at OMDC, including approximately 61 pertaining to healthcare alone. *Id.* Moreover, those approximately 61 health care policies are accompanied by various forms and appendices, which brings the total number of health-care policy related documents to more than 400 at OMDC. *Id.*

Warden LaRose forwarded this communication to ICE leadership, who followed up with Dr. Thihalolipavan regarding the scope of his request for a broader inspection and

access to detainees and their medical records. Between February 23, 2026, and March 6, 2026, the parties engaged in follow-up exchanges via email regarding the expanded scope of the inspection sought by the County. ICE officials requested more information about the scope of the inspection, its purpose, and the authority authorizing it. ECF No. 3-2 at 45–53. The County provided ICE with a 77-page document titled "Title 15 Minimum Standards." Torres Decl. ¶ 8; Torres Ex. 2. To date, ICE's San Diego Field Office is unaware of any other contractor-operated federal immigration detention facility that has ever been subjected to a "Title 15" inspection in accordance with this rubric. Torres Decl. ¶ 8.

On March 5, 2026, ICE Acting Deputy Field Office Director Nathan Cardoza explained that ICE "currently lack[ed] appropriated funding from Congress to conduct an additional inspection" but "remained committed to supporting your inspection efforts." ECF No. 3-2 at 46. ICE thus "respectfully request[ed] clarification" on various items as follows:

- **Inspection Report:** Do you have a standard inspection report template? If so, please provide a copy for our review.
- **Scope and Objectives:** As it is unclear in the provided 77-page document provided [sic], please outline the specific scope and key areas of focus for this inspection.
- **Duration:** Please specify the anticipated duration (number of hours) required to complete the inspection.
- **Inspector Review:** Each inspector will be reviewed by ICE for compliance and access requirements. Please provide the names, titles, and any qualifications or certifications of all inspectors.

*Id.*

In addition, because Plaintiff was also seeking access to detainees themselves, as well as detainee medical records and private information—thus potentially implicating the government's obligations under, e.g., the Privacy Act of 1974 (5 U.S.C. § 552a)[3] and DHS

---

[3] 5 U.S.C. § 552a(b) provides, subject to several enumerated exceptions and definitions, that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except

Privacy Act Regulations (6 C.F.R. § 5.21(d))[4]—ICE also requested that the inspection team identify such individuals in advance and ensure that they executed a signed privacy waiver. ECF No. 3-2 at 46.[5] Cardoza emphasized,

> We want to make it abundantly clear that we are not denying your current request to inspect the facility. Once we receive the requested information, DHS is fully funded, and normal operations are resumed, we will coordinate accordingly and communicate any limitations of the inspection.

*Id.* In response, Dr. Thihalolipavan asserted that the County had the "clearly established statutory right to inspect" OMDC and that "lack of appropriations is not a valid reason to deny this right." *Id.* at 45. Dr. Thihalolipavan's response did not address ICE's point regarding the necessity of privacy waivers for the inspection team to interview detainees or access their medical records. *See id.*

On March 10, 2026, the County filed this lawsuit and a motion for preliminary injunction, seeking an order "prohibiting Defendants from preventing Plaintiff's health and safety inspection of the Facility according to applicable standards and utilizing identified (and pre-cleared) inspection-team designees." ECF No. 3-1 at 18.

Neither the complaint nor the motion specifies which "applicable standards" Plaintiff is referencing. To the extent Plaintiff means to refer to the entirety Title 15 of the California Code of Regulations, ECF No. 3-1 at 7, that voluminous provision fails to give Defendants any reasonable notice of the actual scope of Plaintiff's desired inspection. Based on Plaintiff's motion alone, Plaintiff's interpretation of those standards would appear to require that ICE grant Plaintiff and its "designees" (no matter their qualifications) unfettered access to the facility, the detainees, and their records—far beyond the parameters of the California

---

pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains[.]"

[4] There are a myriad of other federal statutes and regulations that may serve as a further restriction on the release of information pertaining to ICE detainees, including 8 C.F.R. § 236.6, 8 U.S.C. § 1367, 8 U.S.C. § 1254a(c)(6), 8 C.F.R. § 208.6, and 8 C.F.R. § 244.16.

[5] *See* ICE Form 60-001: Privacy Waiver Authorizing Disclosure to a Third Party, *available at* https://www.ice.gov/node/60831 (last visited Apr. 14, 2026).

AG's customary AB-103 inspections and without regard to any limitations imposed by federal law.

Given the complexity of the issues presented—as well as ICE's continued commitment to provide the County with any and all access it is legally required to provide—Defendants asked Plaintiff to agree to a 30-day extension of time for Defendants to respond to Plaintiff's preliminary injunction motion. ECF No. 13. Plaintiff refused to agree to any extension. *See id.* at 2. Defendants thus turned to the Court, which gave Defendants an additional 14 days. ECF No. 17. ICE is continuing to evaluate Plaintiff's demands to determine what additional access or information can lawfully be provided to the County—including by offering the two county supervisors the same facility tour that ICE provides to federal elected officials—and whether there is any possibility of resolving this case without Court intervention. Torres Decl. ¶ 9.

In the meantime, the Federal Defendants oppose Plaintiff's request for a preliminary injunction that would essentially grant the County—along with two of its officials who are not public health experts—unprecedented access to a federal immigration detention facility and its records, while diverting the limited available resources of an impacted federal agency and contractor during a partial government shutdown. The expansive scope of Plaintiff's demands violates the constitutional principle of federal supremacy, and Plaintiff is unlikely to succeed on the merits of its claims that Defendants have violated the Administrative Procedure Act in declining to grant Plaintiff unfettered access to a federal contractor's secure facility, the individuals detained there, and their private medical records. Moreover, Plaintiff has made no showing that irreparable harm is likely to occur in the absence of such immediate access; indeed, Plaintiff's motion points to no deficiencies its team identified in inspecting multiple areas of the facility in February 2026, nor does Plaintiff identify any particular policies the inspection team requested and were denied. Instead, Plaintiff's claim of irreparable harm relies largely upon media reports and detained petitioners' unverified allegations in separate habeas petitions not currently pending before this Court. Meanwhile, the balance of equities and the public interest weigh against granting

*Defendants' Opposition to Plaintiffs' Motion*
*for Preliminary Injunction*

12

26-cv-01520-JES-MSB

so broad and unprecedented an injunction while major questions about the constitutionality of Plaintiff's demands exist, and while ICE has expressed its willingness to work with the County to potentially allow the County's qualified subject matter experts to receive the information they are seeking (subject to federal privacy laws and proper federal security concerns).

The Court should thus deny Plaintiff's motion for preliminary injunction and all relief requested by Plaintiff at this time.

## III.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008). A stay "is not a matter of right, even if irreparable injury might otherwise result" but rather an exercise of judicial discretion that depends on the particular circumstances of the case. *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citation omitted). To justify an injunction, a movant must establish that: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20.

Preliminary relief is meant to preserve the status quo pending final judgment. *Sierra On-Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1422 (9th Cir. 1984). When preliminary relief would change the status quo and "order[] a responsible party to take action," it is "particularly disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citations omitted). In such cases, the moving party "must establish that the law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015) (emphasis original).

Here, these factors weigh against Plaintiff's motion.

## IV.   ARGUMENT

### A.   Plaintiff is unlikely to succeed on the merits of its claims.

Plaintiff's first cause of action is brought under the Administrative Procedure Act, which provides that a court may hold unlawful or set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See* ECF No. 1 at 7. In its motion, Plaintiff contends it is likely to succeed on this claim because Defendants (1) improperly limited the scope of Plaintiff's inspection and (2) denied access to the two county supervisors who were not public health officials. Plaintiff's second claim, also premised on the same actions, asserts that Defendants "unlawfully withheld and unreasonably delayed granting Plaintiff's access" under the APA. ECF No. 1 at 8 (citing 5 U.S.C. § 706(1)). Plaintiff's third cause of action is a derivative claim seeking injunctive and declaratory relief based on its APA claims. ECF No. 1 at 9.

Plaintiff's claims are unlikely to succeed for multiple reasons.

### 1.   Plaintiff's claims are barred by the Supremacy Clause.

Defendants have not yet had the opportunity to file their responsive pleadings in this matter or to formally interpose their defenses to Plaintiff's claims. However, ICE anticipates pursuing defenses based on, inter alia, the Constitution's Supremacy Clause and the corresponding doctrines of (1) intergovernmental immunity and (2) preemption.

Under the doctrine of intergovernmental immunity, "activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943); *Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir. 1991) ("[T]he states may not directly regulate the Federal Government's operations or property."). This well-settled principle has been consistently applied to invalidate state laws that impose requirements on federal contractors. In *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189–90 (1956) (per curiam), and *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437, 441 (9th Cir. 1991), states sought to prevent the federal government from entering into agreements with its chosen contractors until the States' own licensing standards were satisfied. The Supreme Court and

the Ninth Circuit, respectively, struck down these state laws because they "evinced states' active frustration of the Federal Government's ability to discharge its operations." *United States v. California*, 921 F.3d 865, 885 (9th Cir. 2019). Similarly, in *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), California attempted to impose more stringent environmental cleanup standards on a federal contractor than those imposed on the contractor by the federal Department of Energy. *Id.* at 834–37. The Ninth Circuit rejected the state's effort, holding that California violated intergovernmental immunity by "overrid[ing] federal decisions as to necessary decontamination measures" and "regulat[ing] not only the federal contractor but the effective terms of federal contract itself." *Id.* at 840; *see also California*, 921 F.3d at 880 (noting that intergovernmental immunity is implicated when state laws "directly or indirectly affect[] the operation of a federal program or contract").

State laws are also invalid if they "discriminate against the Federal Government or those with whom it deals." *California*, 921 F.3d at 878 (citations and alterations omitted) (quoting Boeing, 768 F.3d at 839). This "nondiscrimination rule prevents states from meddling with Federal Government activities indirectly by singling out for regulation those who deal with the government." *In re Nat'l Sec. Agency Telecomm. Records Litig.*, 633 F. Supp. 2d 892, 903 (N.D. Cal. 2007). Intergovernmental immunity is therefore violated when a State "treats someone else better than it treats" the United States or its contractors. *Washington v. United States*, 460 U.S. 536, 544–45 (1983). Here, while Plaintiff attempts to emphasize that it also performs Title 15 inspections on detention facilities falling under state authority, Dr. Thihalolipavan notably stops short of testifying that he personally attends these inspections or why he deemed it necessary to do so for OMDC. Nor is there any evidence in the record that county supervisors have ever previously attended a Title 15 inspection conducted by the County, or that the scope of the County's inspection request here was consistent with its standard practices. Moreover, it is the federal government and its contractors alone who are required to submit to burdensome inspection requests pertaining to a set of voluminous detention standards that are different from the ones they

are actually governed by. These facts raise at minimum an inference of discriminatory treatment that the United States has a right to probe in discovery and at trial.

Meanwhile, under the doctrine of conflict preemption, "state laws are preempted when they conflict with federal law. This includes cases where 'compliance with both federal and state regulations is a physical impossibility,' and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 567 U.S. 387,399 (2012) (first quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, (1963); then quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Here, because the full scope of Plaintiff's requested inspection remains unclear to Defendants, Defendants are presently unable to take an exhaustive position as to what extent the inspection authority conferred by Section 101045—and the Title 15 standards it incorporates by reference—may be preempted by federal law. As an example, however, Defendants point to Plaintiff's demand for detainee medical records, which the County maintains it is entitled to review under Section 101045. But Plaintiff offered no cooperation with Defendants' attempts to ensure that its provision of any such records would not violate the federal Privacy Act or other potentially relevant federal privacy laws and regulations. That conflict raises preemption concerns.

Plaintiff nevertheless claims that "Section 101045 is not federally preempted or subject to intergovernmental immunity." ECF No. 3-1 at 13 (citing *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 761 (9th Cir. 2022); *United States v. California*, 921 F.3d 865, 886 (9th Cir. 2019); *Geo Grp., Inc. v. Newsom*, No. 2:24-CV-02924-DAD-CSK, 2025 WL 1285728, at *5, *8 n.7 (E.D. Cal. May 2, 2025)). Yet the two Ninth Circuit cases Plaintiff cites merely confirm the premise that privately operated federal detention facilities are not wholly exempt from state health and safety inspections. Both Ninth Circuit cases predate SB-1132's amendment of Section 101045, and neither stands for the proposition that federal facilities must grant county officials so unprecedented a level of access as that which Plaintiff claims to be required by Section 101045. Nor does either case contain any

indication that a state's authority to inspect the health and safety conditions of private detention facilities overrides the protections of federal privacy law with respect to individual detainee information and medical records. Meanwhile, this case is in an entirely different posture than *Geo Group, Inc. v. Newsom*, where a court in the Eastern District of California dismissed a federal contractor's challenge to Section 101045 because the contractor had failed to meet the high bar to establish *pre*-enforcement standing on the basis of the statute's inspection requirement alone. *Geo Grp.*, 2025 WL 1285728, at *6. Here, by contrast, it is undisputed that the County is *currently* seeking to enforce the inspection and access provisions of the statute, and Defendants intend to present evidence as to the unique and undue burdens that those demands for unlimited access and information create for ICE and CoreCivic. Those burdens include, but are not limited to: the admission of individuals who are not public health officials to inspect secure areas of a federal detention facility, the unwarranted diversion of federal immigration resources to respond to information demands based on an ambiguous set of detention standards that do not even apply to the federal government or its contractors in the first place, and the potential violation of federal law via the forced disclosure of personal medical records and data to third parties without the subjects' consent.

## 2. Plaintiff's claims fail on the merits.

Even if the Court concludes that Plaintiff's claims are not barred by the Supremacy Clause, intergovernmental immunity, or preemption, Plaintiff is still unlikely to prevail.

With respect to Plaintiff's claim that Defendants interfered with its inspection rights, Plaintiff's motion asserts that Defendants "prevented Plaintiff from inspecting the Facility," and "Plaintiff was only able to make limited observations of the medical and kitchen areas, and had limited discussions with staff." ECF No. 3-1 at 6, 9. Plaintiff further asserts that it provided "advanced [sic] notice that Plaintiff would require access to . . . foundational items" including "access to medical records, ability to inspect all areas (including the general population and housing areas), ability to talk to individuals who are detained as well

as staff, and ability to review policies and procedures." *Id.* at 9. As outlined above, none of these assertions is accurate.

In addition, to the extent that Defendants are subject to Section 101045's mandates, Plaintiff has provided no authority for the proposition that the elected county supervisors are entitled to participate in the health and safety inspection contemplated by the statute. Section 101045 mandates that "*the county health officer* shall, at least annually, investigate health and sanitary conditions in a county jail, publicly operated detention facility in the county, and private work furlough facility and program," "may make additional investigations of a city jail, private detention facility, or other detention facility as they determine necessary," and "shall submit a report to the Board of State and Community Corrections, the sheriff or other person in charge of the jail or detention facility, and to the board of supervisors" (emphasis added). Section 101045(b) further provides that upon request "by the sheriff, the chief of police, local legislative body, or the Board of State and Community Corrections . . . *the county health officer* . . . shall investigate health and sanitary conditions in a jail or detention facility described in this section, and submit a report to each of the officers and agencies authorized in this section to request the investigation and to the Board of State and Community Corrections" (emphasis added). Thus, while the statute requires the County Public Health Officer to inspect a private detention facility, such as OMDC, if requested by certain enumerated officials or bodies, including the Board of Supervisors, and to submit a report to the Board of Supervisors, it does not authorize any member of the Board of Supervisors to participate in or attend the inspection. And although Plaintiff's motion makes clear that the County conducts inspections of its own facilities pursuant to Section 101045, Plaintiff does not assert that any of those inspections were attended by any county supervisor. In short, in demanding that Defendants permit the county supervisors to participate in health and safety inspections at OMDC, Plaintiff seeks to impose on Defendants a burden that is not supported by any statutory requirements or the County's own course of conduct at all other, non-federal detention facilities. Plaintiffs

are unlikely to prevail on their claim that Defendants violated the APA in declining to admit those individuals to detainee areas of OMDC.

For the foregoing reasons, Plaintiff is unlikely to succeed on the merits of its claims that Defendants violated the APA via agency action that was contrary to law, arbitrary and capricious, unlawfully withheld, or unreasonably delayed. Plaintiff is also thus unlikely to prevail on its derivative claim seeking final injunctive and declaratory relief. Plaintiff's requested preliminary relief is therefore improper here.

**B.** **Plaintiff will not suffer irreparable harm in the absence of immediate relief.**

A plaintiff seeking the extraordinary remedy of a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter,* 555 U.S. at 22 (citation omitted). The "possibility" of such harm is insufficient, *id.,* as is "speculative injury," *id.* at 21; a plaintiff must show both immediacy and likelihood that they will be irreparably harmed absent emergency relief. *See Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir 1988).

Plaintiff fails to make that showing here. The County acknowledges that its Public Health Officer and medical consultant were granted access to multiple areas of the facility, and they also conducted interviews with healthcare, food services, and laundry staff. LaRose Decl. ¶¶ 31–34; LaRose Attm. H (photos). Neither attendee asked to visit any housing units or any other areas of the facility during the inspection, and the request for CoreCivic policies was not made until after the inspection. LaRose Decl. ¶ 39. Section 101045 does not authorize inspection by the county supervisors, and Plaintiff has cited no other authority requiring their attendance at a health and safety inspection. In addition, the very emails submitted by Plaintiff show that ICE was willing to work with Plaintiff to determine whether there was any additional access or information it could provide to the appropriate officials, subject to the proper security protocols and federal laws and regulations. CoreCivic is also willing to accommodate requests for specific facility policies that are not otherwise barred from disclosure. LaRose Decl. ¶ 60. And ICE has also offered

to provide its standard tour for elected officials to the two county supervisors. Torres Decl. ¶ 9.

Moreover, Plaintiff identifies no deficiencies it located in the areas that Dr. Thihalolipavan and Ms. Booth visited, nor does it name any follow-up questions it submitted that Defendants failed to answer. But even if Plaintiff had noted any deficiencies, as acknowledged in Dr. Thihalolipavan's declaration (ECF 3-2 at 8, ¶ 20), Section 101045 contains no enforcement mechanism for compelling Defendants' compliance with Title 15, and accordingly, "the submitted reports will not be processed."

Because the County's health officer and medical consultant were permitted to inspect the facility, there is no legal authority authorizing the elected county supervisors to participate in a health and safety inspection, and any findings made as a result of the inspection will not be processed and cannot be enforced, Plaintiff fails to establish that it would be irreparably harmed in the absence of the requested preliminary injunction.

## C.    The remaining preliminary injunction factors weigh in Defendants' favor.

Plaintiff must also demonstrate that "the balance of equities tips in [its] favor" and that "an injunction is in the public interest." *Winter,* 555 U.S. at 20 (citation omitted). These "factors merge when the Government is the opposing party." *Nken,* 556 U.S. at 435.

Because Plaintiff is seeking to enforce Section 101045 in a manner that likely offends the Constitution's Supremacy Clause, the balance of equities favors Defendants and an injunction is not in the public interest. *Cf. Ariz. Dream Act Coal., v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) ("[B]y establishing a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction."). *See also United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *aff'd in part, rev'd on other grounds*, 567 U.S. 387 ("'[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available . . . . In such circumstances, the interest of preserving the Supremacy Clause is

paramount.'" (quoting *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852–53 (9th Cir. 2009)).

Therefore, the balance of the equities and public interest favor denying Plaintiffs' request for a preliminary injunction.

### D.   Plaintiff's requested preliminary injunctive relief violates Federal Rule of Civil Procedure 65.

Rule 65(d) "requires that injunctions 'shall be specific in terms; [and] shall describe in reasonable detail ... the act or acts sought to be restrained.'" *Portland Feminist Women's Health Ctr. v. Advocs. for Life, Inc.*, 859 F.2d 681, 685 (9th Cir. 1988) (quoting Fed. R. Civ. P. 65(d)(1)). Here, Plaintiff seeks an injunction "prohibiting Defendants from preventing Plaintiff's health and safety inspection of the Facility according to applicable standards." ECF 3-1 at 18. But Plaintiff fails to establish which specific standards it contends are "applicable." This language is far too vague to support an injunctive order. *See id.* ("The Supreme Court has indicated that the policy behind [Rule 65] is 'to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.'").

### E.   Any injunctive relief should be accompanied by a bond.

Should the Court grant Plaintiff's motion, in whole or in part, any preliminary injunction should also be accompanied by a bond pursuant to Federal Rule of Civil Procedure 65(c). As the Court of Appeals for the D.C. Circuit recently clarified, "injunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam). The Court has broad discretion to determine the amount of an appropriate bond. If the Court were to enter an injunction, Defendants ask that the bond amount reflect the cost and disruption to CoreCivic and the federal government's administration of OMDC resulting from Plaintiff's requested relief.

/ / /

/ / /

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

DATED: April 15, 2026

Respectfully submitted,

ADAM GORDON
United States Attorney

*s/ Betsey Boutelle*
BETSEY BOUTELLE
Assistant U.S. Attorney

Attorneys for Federal Defendants